UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JOSÉ A. DÍAZ LÓPEZ;<br><br>**Plaintiffs,**<br><br>vs.<br><br>HOSPITAL PAVÍA SANTURCE; DR. HÉCTOR M. MALDONADO GONZÁLEZ; CONJUGAL PARTNERSHIP constituted between DR. HÉCTOR M. MALDONADO GONZÁLEZ and his wife JANE DOE MALDONADO; PROFESSIONAL PARTNERSHIP X, Y & Z; RICHARD ROE; DOCTOR JOHN ROE; CORPORATIONS X, Y & Z;<br><br>**Defendants.** | CIVIL NO.  3:15-cv-1177<br><br>PLAINTIFFS DEMAND<br>TRIAL BY JURY |

**COMPLAINT**

**TO THE HONORABLE COURT:**

**COME NOW** plaintiffs through their undersigned attorney and very respectfully **STATE, ALLEGE AND PRAY:**

**I.    JURISDICTION**

1.1    The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, Section 1332 (a) (1).

1.2    This action is of a civil nature, invoking exclusive of interest and costs a sum in excess of Seventy Five Thousand ($75,000.00) dollars.  Every issue of law and fact alleged herein is wholly between citizens of different states.  Plaintiff invokes the diversity jurisdiction of this Honorable Court pursuant to the provisions of Article III of the Constitution of the United States.

1.3     The Statute of Limitations was tolled by plaintiffs' filing of a complaint in the Court of First Instance of the Commonwealth of P.R. on January 10, 2014, with was voluntarily dismissed without prejudice on April 8, 2014.

1.4     Because of plaintiffs' lack of information and knowledge regarding all the facts and events that surrounded Mr. Iván Díaz de Aldrey's damages, the complaint was filed with the purpose of tolling the statute of limitations in the torts action.

## II.     THE PARTIES

2.1     Plaintiff, José A. Díaz López, is the son of Iván Díaz de Aldrey. He is of legal age, is and has been citizen and resident of the state of Maryland and is domiciled at 8320 Colesville Road, Apt. 203, Silver Spring, Maryland, EE. UU., 20910.

2.2     Defendant, Hospital Pavía Santurce, is an entity organized under the laws of the Commonwealth of Puerto Rico, with its principal place of business in the said Commonwealth of Puerto Rico.

2.3     Co-defendant, Dr. Héctor M. Maldonado González, and the Conjugal Partnership constituted between him and his wife, Jane Doe Maldonado, are citizens of the Commonwealth of Puerto Rico and are jointly and severally liable to plaintiffs.

2.4     Co-defendants, whose names are unknown to plaintiffs, Richard Roe, Dr. John Roe are citizens of the Commonwealth of Puerto Rico and are jointly and severally liable to plaintiffs. The Conjugal partnerships constituted by them with their unknown spouses are also liable to plaintiff inasmuch as they benefited from their negligent acts.

2.5     Co-defendants, Corporations X, Y & Z, whose name is unknown to plaintiffs, is/are an entity(ies) organized under the laws of the Commonwealth of Puerto Rico, with its principal place of operation in the said Commonwealth of Puerto Rico.

2.6     Co-defendants, Professional Partnerships X, Y & Z, whose name is unknown to plaintiff, are entities organized under the laws of the Commonwealth of Puerto Rico, with its principal place of operation in the said Commonwealth of Puerto Rico.

## II.     ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

3.1     On January 10, 2013 around 8:30 PM, Mr. Iván Díaz de Aldrey, distinguished attorney, 87 years old, was taken by his son to the emergency room at Hospital Pavía Santurce, to be treated for a fall that he suffered in his home, which had caused him trauma and acute hematoma to his head on the right side and a laceration over his right eyebrow which was bleeding profusely.

3.2     He was treated by the medical and paramedical personnel at the emergency room where a head CT Scan was ordered along with other tests.

3.3     The emergency physician and/or codefendant Dr. Maldonado González interpreted the CT Scan images as being negative.

3.4     Around 1:20 AM, the emergency physician placed consultations to co-defendant, Dr. Héctor Maldonado González, internal medicine, and Dr. Carlos Díaz, cardiologist, since the troponine levels were elevated.

3.5     At that time the emergency physician also ordered cardiac monitoring, aspirin 325mg., Lovenox and Plavix.

3.6     Co-defendant Dr. Maldonado González evaluated Mr. Díaz de Aldrey at 4:00 AM and diagnosed a Non ST Myocardial Infarction, Syncope and Trauma to the head with a Negative CT Scan.

3.7     The cardiologist, Dr. Carlos Díaz, examined the patient at 4:30 AM.

3.8     At 4:00 AM, Dr. Maldonado González admitted the patient for treatment of the

Non ST Myocardial Infarction placing orders for Lovenox, Plavix and aspirin, amongst others.

    **3.9**    The head CT Scan done on January 10th was officially interpreted on January 11th, and revealed: "Small amount of post-traumatic extra axial hemorrhage centered at the ambient cistern. **Follow up advised**" **The CT was not negative as had been documented by the physicians.**

    3.10    The physicians determined that the fall had been caused by a small cardiac infarction, so he remained hospitalized for observation and cardiac treatment until he was discharged home on January 15th, 2013.

    3.11    During this hospitalization he continued to be treated with anticoagulants; however, negligently, no adequate follow up of the intra-cranial bleed which had been reflected in the CT Scan was provided, a consultation to neurology was not placed nor a follow up CT Scan performed.

    3.12    Despite the fact the he had suffered severe trauma to his head, when the patient was discharged home on January 15$^{th,}$ he was not informed nor alerted of the need to follow up and monitor his head trauma and intracranial bleed. At no point was Mr. Díaz nor any member of his family informed of the presence of intracranial bleeding, nor were they alerted to the possibility of further bleeding.

    3.13    Around the week of February 18th, 2013, Mr. Díaz de Aldrey started noticing symptoms of loss of balance, loss of strength in his extremities, loss of memory, spatial and temporal disorientation, so he made an appointment with Dr. Ivette Rosario, internal medicine specialist.

    3.14    He was taken to the appointment in February 28th by his son, Iván Díaz López, since his father was very disoriented and had difficulty walking.

3.15   Dr. Rosario noticed that Mr. Díaz de Aldrey was disoriented, speaking incoherently, and had little balance, directing most of the interview at the son.  During said interview, Dr. Rosario informed being aware of the fall and the head trauma that Mr. Díaz had suffered and was under the belief that the head CT Scan was negative.

3.16   Dr. Rosario directed the patient to make an appointment for a new CT Scan and to make an appointment with her once he had the results so that she could evaluate his condition.

3.17   On that same night on February 28th, 2013, Mr. Díaz de Aldrey had another fall, this time suffering severe trauma to the left side of his head.

3.18   Mr. Díaz de Aldrey was immediately taken by ambulance to the emergency room of Pavía Hospital Santurce and was evaluated at 12:55 AM on March 1, 2013.  A head CT Scan was ordered which revealed a left temporal cephalohematoma and surrounding soft tissue swelling w/o underlying skull fracture.  Bilateral subdural hematomas with sub-acute and hyperacute components, with associated leftward infarction.  Bilateral SDH and leftward midline shift.

3.19   The orbital CT Scan revealed bilateral subdural hematomas with superimposed acute bleeding.

3.20   The emergency physician placed a consultation to Dr. Ivette Rosario, internal medicine, who ordered admission to the hospital and placed a consultation to the hospital's neurosurgeon, Dr. Julio Rosado.

3.21   Upon evaluation, Dr. Rosado's findings were increased intracranial pressure right and left; and chronic sub-acute subdural fluid right  larger size than left.

3.22   Dr. Julio Rosado proceeded with surgery on that morning and performed a bilateral craniotomy.

3.23    The operation report described chronic bilateral subdural hematomas, larger on the right hand side, which were evacuated; also removal of subdural membranes and placement of bilateral subdural drainages.

3.24    After said surgery, Dr. Rosado informed plaintiffs that he had drained the blood on both sides of the brain and that the blood in the right side was dryer and darker than the left side; so he believed it was older blood and that he hoped that the patient would recover and go back to his normal state before the falls.

3.25    Mr. Iván Díaz de Aldrey remained in the Intensive Care Unit for almost two (2) weeks without regaining consciousness and was eventually discharged home on March 19, 2013, still disoriented and without full recovery.

3.26    During his hospitalization the patient suffered a pneumocephalus post-surgery, remained lethargic, disoriented, poor response to stimuli, sporadic convulsions and fluid accumulation in the subdural spaces.

3.27    Mr. Díaz de Aldrey was discharged home with instructions for a CT Scan in one month as follow up of his neurological condition and state.

3.28    On March 25th, 2013, Mr. Díaz de Aldrey was again taken in ambulance to the emergency room at Hospital Pavía Santurce with a swollen leg and suffering urinary retention. A Doppler was performed and he was diagnosed with deep vein thrombosis (DVT).

3.29    He was again hospitalized, and because of his previous intracranial bleeding, anticoagulation was contraindicated and opted for placement of a vena cava filter.

3.30    On March 27th, Dr. Julio Rosado determined that Mr. Díaz de Aldrey had bilateral residual subdural hematomas with mass effect for which he considered performing a new surgery to release the pressure after the vena cava filter was placed and the urinary condition was treated.

3.31    By March 31$^{st,}$ the patient evidenced loss of capacity to swallow and feeding problems.

3.32    On April 3$^{rd,}$ he was again subjected to bilateral frontal craniotomies, evacuation of the hematomas and placement of subdural drainages.

3.33    After this intervention, both Dr. Rosado and Dr. Rosario concluded and diagnosed that Mr. Díaz de Aldrey had suffered permanent and irreversible neurological damage.

3.34    On April 4th, a gastrostomy was performed in order to feed him due to the dysphagia that he had developed post intracranial bleed and because he could not swallow.

3.35    On April 13$^{th,}$ Mr. Díaz de Aldrey was discharged home with a diagnosis of organic dementia secondary to chronic bilateral subdural hematomas with elevated intracranial pressure.

3.36    The medical and paramedical personnel of Hospital Pavía Santurce caused, by their negligence, his condition and/or allowed it to deteriorate.

3.37    As a result of the errors and omissions and inadequate and clearly erroneous medical treatment, as well as an evident abandonment and disregard for his well being by the hospital personnel, Mr. Díaz de Aldrey's suffered irreversible and permanent cerebral damage.

3.38    Mr. Díaz de Aldrey, who was fully independent and functional, in full control of his faculties before his first hospitalization, has remained disoriented, suffering hallucinations, excruciating physical discomfort, partial amnesia, fecal and urinary incontinence, has suffered multiple complications from infections because of the folley catheters and the gastrostomy tubing and has been reduced to a life bedridden and on wheelchair dependent and in need of 24 hour care and assistance for his basic needs.  This has resulted in his sons and daughter having to dedicate themselves to his care, coordination and supervision of all his physical and

medical needs and has deeply affected and caused immense suffering, pain and anguish to plaintiff.

3.39  As a direct cause of the negligence of the physicians and personnel of Hospital Pavía Santurce in erroneously interpreting the CT Scan images of February 10th, 2013 and/or ignoring the official interpretation of said CT Scan which revealed intracranial bleeding, multiple errors in treatment and in lack of monitoring and supervision of the bleed were committed which in turn resulted in further intracranial bleeding, which was not detected, and the deterioration and permanent and irreversible brain damage that Mr. Díaz de Aldrey has suffered and will continue to suffer.

3.40  The medical record is scant, deficient and inconsistent with respect to crucial events and it contains multiple illegible entries. As a result, plaintiffs still don't have knowledge of all the facts relevant to the medical malpractice and all the parties involved.

3.41  Mr. Díaz de Aldrey had an obvious and evident neurological emergency while under the care and supervision of Hospital Pavía Santurce personnel, which was not identified nor treated in a timely and adequate manner, directly causing and/or contributing to his deterioration and irreversible and permanent damages.

3.42  Mr. Díaz de Aldrey was a patient at risk for intracranial bleeding after the trauma suffered, his age and the anticoagulation treatment that he was given for his cardiac condition.

3.43  Mr. Díaz de Aldrey was treated by the physicians, nurses and paramedical personnel of Hospital Pavía Santurce and they are therefore, jointly liable to plaintiffs for their negligent acts and/or omissions under the provisions of Articles 1802 and 1803 of the Puerto Rico Civil Code.

3.44  Mr. Díaz de Aldrey's damages were caused by the negligent and/or late treatment

that was given to him by Hospital Pavía Santurce's medical and paramedical personnel, including Dr. Maldonado González and other unknown co-defendants. Had it not been by all the tortious and negligent acts, errors and omissions of all co-defendants his damages, as well as plaintiffs' damages should have been avoided.

3.45   All co-defendants are liable to plaintiffs under Articles 1802 and 1803 of the Puerto Rico Civil Code for their torts and negligent acts and omissions, which departed from the standards of medical care and treatment recognized as adequate by the medical profession in light of the modern means of instruction, education and communication, and directly caused and/or contributed to Mr. Díaz de Aldrey's damages as well as to injuries suffered by plaintiffs. Plaintiffs also estimate that Hospital Pavía Santurce medical and paramedical personnel did not display the care, nor the cautionary measures that a prudent and reasonable man would in such circumstances, thus not offering Mr. Díaz de Aldrey the medical attention that was due to him.

3.46   Co-defendant, Hospital Pavía Santurce, was grossly negligent for not procuring nor providing Mr. Díaz de Aldrey with competent medical and paramedical personnel for identifying, treating and correcting his evident emergency condition. Their negligent acts, errors and omissions directly caused and/or contributed to the damages and deterioration of Mr. Díaz de Aldrey, who had arrived at the Hospital with a treatable condition and had been under the supervision and monitoring of its personnel.

3.47   Co-defendant, Hospital Pavía Santurce, is also liable for the negligent and inadequate medical treatment given to the patient by its medical and paramedical personnel, including co-defendant, Dr. Maldonado González, and unknown co-defendants; for failure to timely identify Mr. Díaz de Aldrey's emergency condition; for lack of supervision and monitoring; for the delayed and/or lack of implementation of diagnostic and therapeutic orders

by its personnel; for allowing scant and deficient medical record keeping and/or alteration and manipulation of the medical record; for allowing practices in the management of the patient in violation of its own protocols and of the best practice of medicine; for not providing Mr. Díaz de Aldrey with competent medical and paramedical personnel for identifying, treating and correcting his evident emergency condition and avoiding further complications; for not placing the necessary consultations with specialists; for not providing him with adequate neurological evaluation, among others. The negligent acts, errors and omissions of their medical, technical, administrative and paramedical personnel directly caused and/or contributed to the damages and deterioration of Mr. Díaz de Aldrey.

3.48    Co-defendant, Dr. Héctor M. Maldonado González, was grossly negligent and is liable for the negligent and inadequate medical treatment given to the patient, to wit: lack of supervision and follow up of a patient at risk of complications; failure to adequately interpret laboratories and tests results; failure to insure adequate supervision and monitoring and administration of medications by the hospital personnel; failure to provide Mr. Díaz with adequate treatment and the necessary specialists for his conditions; for causing the rapid deterioration of the patient; for his failure to insure that Mr. Rivera was treated in a timely manner and by competent physicians; delaying diagnosis and treatment of Mr. Díaz's condition; failure to order medications and necessary diagnostic tests which were indicated for his treatment; failure to identify the intracranial bleeding and /or failure to warn the patient and his family of his risk for further bleeding. His negligent acts, errors and omissions directly caused and/or contributed to the damages, deterioration and permanent damages of Mr. Díaz de Aldrey. The Conjugal partnership constituted by him with his unknown spouse, Jane Doe Maldonado, is also liable to plaintiff inasmuch as they benefited from the physicians' negligent acts.

3.49 As a direct consequence of herein co-defendants gross negligence, plaintiff, José A. Díaz López, has suffered, suffers and will forever suffer deep and severe mental and emotional anguishes, severe depression, and loss of enjoyment of life for the loss of his beloved father's counseling and emotional support and for seeing him suffer and endure intense hardships in the last years of his life. He requests as compensation for his damages a sum of not less than Five Hundred Thousand Dollars ($500,000.00).

**WHEREFORE**, plaintiffs respectfully request from this Honorable Court to:

1. Grant a judgment against co-defendants for the sums herein requested together with pre-judgment interests, costs and reasonable attorney's fees.

2. Grant plaintiffs such other relief, as it may deem proper and necessary under the circumstances.

3. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs also hereby request a trial by jury in this action.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 26th day of February, 2015.

**S/Rafael E. García Rodón**
**RAFAEL E. GARCIA RODON**
**USDC-PR No. 129911**
Banco Popular of PR Bldg.
206 Tetuán Street
7th Floor, Suite 701
San Juan, PR  00901
Tel. (787) 722-7788
Fax (787) 722-7748
E-mail: rgrlaw@gmail.com